**Ulysses JANUARY, Willie Salter and James K. Bell, Plaintiffs,**

v.

**STOLARUK CORPORATION, Defendant.**

**Civ. A. No. 82–CV–73856–DT.**

United States District Court, E.D. Michigan, S.D.

April 28, 1988.

---

Joseph L. Konheim, Southfield, Mich., for plaintiffs.

Sheryl A. Laughren, Detroit, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER

WOODS, District Judge.

Ulysses January, Willie Slater, and James Bell filed this action against Stolaruk Corporation on October 13, 1982. They alleged Stolaruk denied them promotional opportunities and paid unequal wages because of their race, black, in violation of 42 U.S.C. § 2000e and M.C.L. § 37.2101. The plaintiffs further alleged that the defendant retaliated against them when they filed claims with the Equal Employment Opportunity Commission (EEOC) and the Michigan Department of Civil Rights (MDCR) by not calling them back to work.

## BACKGROUND

During the period in which the plaintiffs were employed, Stolaruk Corporation was, in part, in the asphalt paving business. Within the paving division of Stolaruk Corporation, various crews were assigned to different types of work. Certain crews did sewer and underground work; others did conditioning and "prep" work; others did "mainline" asphalt paving, and still others operated on an as-needed basis and floated from job site to job site.

Conditioning and prep work involves the preparation of roadbeds and other surfaces prior to the application of asphalt. This work was primarily manual and entailed the operation of jack hammers, compressors, trenchers, back hoes, air blowers, clam shells, and various other machinery and equipment. Conditioning crews were responsible for setting up traffic control, grading road beds, installing asphalt by hand, and the cleanup of job sites prior to and following mainline paving crews. Conditioning workers would clean surfaces before tack coat, an asphalt adhesive, was applied. Once the tack coat was in place, the mainline paving crew would lay asphalt and the conditioning crew would pick up the debris, edge the roadways, remove traffic control devices, landscape, and do whatever else the governing contract required to restore the site.

Mainline paving consists of large scale application of asphalt on roadways and parking lots. The crews apply the asphalt with a paver, a large machine that distributes the asphalt mechanically. A mainline paving crew generally consists of seven employees: three operators (one paver, two rollers) and four laborers. The crew is usually supported by one or two conditioning crews.

Mainline paving, without noticeable dissent, was considered the most desirable type of work, and placement on a paving crew was considered a promotion. In this back-breaking and dirty work, the paving crews were clearly the elitists among their coworkers. Conditioning crews, however,

generally worked longer hours than paving crews. They were not limited by ground conditions, precipitation and temperature to the same extent as paving crews. Moreover, they generally worked longer days and hours setting up and taking down traffic control devices and preparing the site before and cleaning the site after the paving crew.

It also appeared to be the case that, over the years, the paving crews were predominately black; the conditioning crews, the least desirable jobs, were filled by white employees.

Stolaruk Corporation hired Ulysses January in 1959 and promoted him to foreman/laborer in charge of a paving crew in 1972. Willie Salter began working for Stolaruk Corporation in 1965. His last position with the corporation was as a screen/raker/laborer and union steward for Laborers Local 1191. In 1968, Stolaruk Corporation hired James Bell as a laborer. Bell's last position with the corporation was an an operator. All three plaintiffs had at one time worked on a conditioning and prep crew; but, by 1972, they were all working on the same mainline paving crew, which was headed by plaintiff January.

The plaintiffs last worked for Stolaruk Corporation on November 21, 1980. On that date, Steven Stolaruk, president of the corporation, telephoned Ulysses January at January's home, which was the usual manner by which January was told where to take his paving crew each day. Stolaruk told January that it was raining at the scheduled work site and the work crew should be put on hold. January responded that he had to pick up the paychecks anyway so he, Salter, and Bell would be at the asphalt yard. The three plaintiffs then drove to the yard in a company pickup truck, which Stolaruk provided to each of the two paving foremen to transport tools.

When the plaintiffs arrived at the asphalt yard, Steven Stolaruk called January on the truck radio and told him to go to the work site because it was not raining. While on their way to the site, January radioed Stolaruk and informed him that rain was approaching the site from the direction of the asphalt yard. Stolaruk told him to come to the work site anyway. Salter told January that he was sick, that he could not and would not work in the rain.

It is unclear what occurred when the three arrived at the job site. Stolaruk walked over to January and the two had a short conversation. At the end of the meeting, January walked back toward Salter and Bell, each of whom had remained in the truck. Stolaruk yelled back to them: "You can leave the truck and walk back to Detroit!"

January, Salter and Bell thereafter filed a grievance with their union. The grievances progressed into charges of discrimination filed with the EEOC and the MDCR. Stolaruk Corporation filed a response to the charges and participated in a hearing before Hector Shamley of the MDCR. At the hearing, Steven Stolaruk agreed that the plaintiffs would return to work in the spring of 1981. Based on this agreement, the plaintiffs withdrew their grievances with the EEOC and MDCR.

During the 1981 paving season, all three plaintiffs received two telegrams. The first one was sent on May 20, 1981, and read as follows:

THIS IS A COPY OF A PREVIOUSLY PHONE DELIVERED TELEGRAM
WORK SCHEDULES AND INCLEMENT WEATHER HAVE PREVENTED US FROM CALLING YOU BACK SOONER WE ANTICIPATE A START DATE FOR YOU OF APPROXIMATELY JUNE 15 1981 AND WILL ADVISE YOU FURTHER AS THAT DATE DRAWS NEAR

The second telegram, which all three plaintiffs received, arrived on July 2, 1981. That telegram provided:

THIS IS A CONFIRMATION OF A PREVIOUSLY PHONE DELIVERED TELEGRAM.
PLEASE BE PREPARED TO RETURN TO WORK ON MONDAY JULY 6 1981 AT 730AM. YOU WILL BE CONTACTED BY TELEPHONE BY MONDAY MORNING DIRECTING YOU WHERE TO REPORT. IF YOU ARE UNABLE

TO START WORK PLEASE ADVISE OUR 8 MILE OFFICE IMMEDIATELY.

Although the second telegram requested the plaintiffs to resume their employment on July 6, 1981, none of the plaintiffs began working for Stolaruk Corporation on that date, nor have any of them ever worked for defendant since November 21, 1980.

Steven Stolaruk, president of Stolaruk Corporation, sold his asphalt paving business in October of 1985. A few of the individuals that were employed in the paving operation were retained by Stolaruk and employed in other divisions of his company. Most of the employees found employment in other asphalt paving companies.

## ISSUES AND FINDINGS

Several issues are in dispute, however, not all need to be resolved to decide plaintiffs' claims. Initially we address the plaintiffs' claims of race discrimination and whether plaintiffs ever sought promotions.

Both Ulysses January and Steven Stolaruk testified that January requested a promotion to superintendent in 1979. January requested the promotion at a meeting between himself, Steven Stolaruk, and Charlie Monger, foreman of Stolaruk Corporation's other paving crew. The meeting occurred after Steven Stolaruk transferred David Hurd from one of the corporation's asphalt manufacturing plants to the field. In the field, Hurd was to act as a liaison between Steven Stolaruk and the various crews. January and Monger expressed dissatisfaction with Hurd's promotion to superintendent because Hurd did not have any previous experience working in the field laying asphalt or performing conditioning and prep work.

Willie Salter testified that he requested to be promoted from a laborer to a paver operator and also that he requested to be promoted to a foreman. Salter contends that he would operate the paver when January was not at the site and that he asked Steven Stolaruk to promote him to foreman when and if January became a superintendent. According to Salter, Stolaruk laughed at his request to be promoted to foreman. Steven Stolaruk testified that Salter never expressed an interest in the foreman position, but on cross examination did not deny that Salter may have asked to be promoted to the position of paver operator.

James Bell asserts that he requested a promotion from Steven Stolaruk during the mid–1970s, while the corporation was paving the parking lot of Fairlane Mall in Dearborn, Michigan. Bell contends that Steven Stolaruk told him he was more valuable as an operator. Stolaruk testified that James Bell never requested a promotion but that he would have considered him for a promotion if his work warranted it.

The Court finds that all three plaintiffs requested promotions. It is undisputed that January requested to be promoted to superintendent at a meeting between Steven Stolaruk, Charlie Monger, and himself.

Although there is conflicting testimony at to Willie Salter's requests to be promoted to paver operator and to foreman, the Court finds that Salter did request to be promoted to paver operator. Steven Stolaruk did not deny that Salter may have requested the position. The Court further finds that Salter never requested the position of foreman.

James Bell's requests for a promotion are also disputed; however, Stolaruk did state that Bell would have been considered for a promotion if his work warranted it. In a considered weighing of the testimony, the Court finds that Bell did request to be promoted.

The next step is to determine whether openings existed in the positions for which, and at the time, the plaintiffs sought the promotions.

Ulysses January requested the position of superintendent in 1979. Stolaruk contends that he did not promote anyone to that position except for Hank Witek, who was given the formal title of superintendent prior to January's requests in 1979, and therefore, no openings for superintendents existed after January's request. The October 31, 1980, Employee Master Listing for Stolaruk Corporation, however, lists David

Hurd as a field superintendent. Moreover, the defendant's response to plaintiffs' interrogatories and the response to plaintiffs' EEOC charges lists David Hurd and Bob Peake as superintendents of the corporation. Accordingly, the Court finds that the defendant had openings in the position of superintendent, the position to which Ulysses January sought to be promoted.

Willie Salter requested the position of paver operator in either 1975 or 1976. Paul Fraley testified that he joined the operators union in July 1978 and worked for Stolaruk Corporation after that date as a paver operator. The Court finds that the position of paver operator was available after Willie Salter requested the position.

James Bell never testified as to which position he sought to be promoted. All inferences lead this Court to find that he sought the position of foreman during the mid–1970s because at that time he was an operator and the next highest position was that of foreman. Since the mid–1970s, Mario Dybek and Gary Ertman acted as foremen of conditioning and prep crews for Stolaruk Corporation. The Court finds that openings existed in the position to which James Bell sought to be promoted.

We next address the question as to whether plaintiffs were qualified for the positions for which they sought promotions.

Steven Stolaruk promoted Bob Peake and David Hurd to superintendent after January had requested the position.

As the superintendent, Bob Peake's duties were varied. He would estimate the cost of laying asphalt for potential customers, submit bids on construction projects, schedule the work of conditioning crews, assist conditioning crews with their work, and check job sites after grader operators were finished to ensure the paving job was done correctly. Peake testified that, prior to his promotion, he had experience in the installation and maintenance of asphalt plants and that he was familiar with the regulations of the Department of Natural Resources that governed pollution control equipment. He further testified that before Stolaruk promoted him to superintend-

ent, he learned how to estimate the cost of laying an asphalt strip, how to read and draft blue prints, and how to survey land. It was also established at trial that Peake had completed a home study course in electronics and attended courses in engineering and mathematics at Chrysler Institute prior to his employment with Stolaruk Corporation.

As a superintendent, David Hurd ensured that there were enough truckloads of asphalt at each job site, ensured that the proper traffic signs were displayed, worked in the asphalt plants, drove trucks, ran jack hammers, filled in on conditioning and prep crews, and acted as a liaison between Stolaruk Corporation, state and county asphalt plant inspectors, and the sellers of asphalt aggregate. Prior to his promotion to superintendent, Hurd managed and maintained one of Stolaruk Corporation's asphalt plants and repaired the company machinery. Hurd also testified that prior to his promotion, he had attended, without completing, a course on construction at Lawrence Institute of Technology and participated in some seminars conducted by the Michigan Department of Transportation and the National Asphalt Paving Association in the 1970s.

There is no evidence that Ulysses January had any formal training in the installation and maintenance of asphalt plants, that he was familiar with the Department of Natural Resources' regulations, that he knew how to estimate the cost of laying an asphalt strip, that he could read and draft blue prints, or that he knew how to survey land. There is also no evidence that he could manage the operations of an asphalt plant, that he could repair company machinery, or that he attended more than one seminar on asphalt paving. Both of the individuals that Stolaruk promoted to superintendent brought unique qualities to the position. Peake's familiarity with estimating and surveying made him an ideal person to manage conditioning and prep crews and submit bid proposals on various construction projects. Hurd's familiarity with the asphalt paving plant made him an ideal individual to act as a liaison between

Steven Stolaruk and the asphalt plant inspectors, the sellers of asphalt aggregate, and the work crews at various sites. Although January had considerable experience paving asphalt, he was not qualified to estimate and submit construction proposals and he did not have the experience in an asphalt plant to qualify him to interact with aggregate sellers and county and state asphalt plant inspectors. Accordingly, this Court finds that Ulysses January was not qualified for the position of superintendent.

Paul Fraley was promoted to the position of paver operator in July 1978, after Salter had requested the position. Fraley was hired by Stolaruk in 1970–71 as a laborer. He testified that he learned how to operate a paver when he was placed on the paver on an as-needed basis while working on a conditioning and prep crew.

Salter began working for Stolaruk Corporation in 1965, five years earlier than Fraley. There is no evidence that Fraley had any special experience or education that made him more qualified to be a paver than Salter. Accordingly, this Court finds that Salter was qualified for the position of paver operator.

Stolaruk Corporation promoted Mario Dybeck, John Hoffman, Jim Uptegrove, David Lemaux, and Roger Harriman to foremen after James Bell requested the position.

Prior to his employment with Stolaruk, Mario Dybeck owned and operated his own underground sewer installation business. Stolaruk hired Dybeck in 1974 and promoted him to foreman of a sewer installation crew in 1977.

Neither side presented evidence of the qualifications of John Hoffman or Jim Uptegrove.

David Lemaux testified that Stolaruk hired him in 1974 and that he began running a conditioning and prep crew in 1975. Lemaux stated that prior to his employment with Stolaruk, he was a Detroit Police Officer and an employee of Michigan Consolidated Gas.

Roger Harriman began working for Stolaruk Corporation in 1974 as a laborer. He quit his job in 1980 and hired in again at Stolaruk Corporation in 1982. Between 1977 and 1980, Harriman was classified as a foreman, however, the only experience he had that qualified him as a foreman was his experience on a conditioning and prep crew.

Although it is evident that Mario Dybeck was more qualified than Bell to be foreman of a sewer installation crew, there is no evidence that either David Lemaux or Roger Harriman were more qualified to be the foreman of a conditioning and prep crew. The Court finds James Bell was qualified to be a foreman.

An analysis of discrimination under M.C. L. § 37.2101 follows the same format as an analysis under 42 U.S.C. § 2000e. *Farmington Educational Assoc. v. Farmington School District*, 133 Mich.App. 566, 351 N.W.2d 242 (1984). Therefore, an analysis of whether the plaintiffs were denied promotions on the basis of race under federal law will serve as a determination under state law.

■ Employment discrimination can be established by proving discriminatory treatment or by proving that the employer's neutral practices have a disparate impact on a protected class. *Chrisner v. Complete Auto Transit, Inc.*, 645 F.2d 1251, 1257 (6th Cir.1987). Disparate treatment is the intentional "treat[ment of] some people less favorably than others because of their race, color, religion, sex or national origin." *Teamsters v. United States*, 431 U.S. 324, 355 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). Disparate impact entails "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Id.* While it is only necessary to establish a discriminatory motive in a case alleging discriminatory treatment, under either theory a plaintiff is required to establish a *prima facie* case of discrimination. *Id.* at 358, 97 S.Ct. at 1866.

The Supreme Court recently outlined the requirements of establishing a *prima facie*

case and the burdens of proof of each party:

A plaintiff alleging one instance of discrimination establishes a prima facie case justifying an inference of individual racial discrimination by showing that he (1) belongs to a racial minority, (2) applied and was qualified for a vacant position the employer was attempting to fill, (3) was rejected for the position, and (4) after his rejection, the position remained open and the employer continued to seek applicants of the plaintiff's qualifications. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 [93 S.Ct. 1817, 1824, 36 L.Ed.2d 668] (1973). Once these facts are established, the employer must produce "evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 [101 S.Ct. 1089, 1094, 67 L.Ed.2d 207] (1981). At that point, the presumption of discrimination "drops from the case," *id.*, at 255, n. 10 [101 S.Ct. at 1095 n. 10], and the district court is in a position to decide the ultimate question in such a suit: whether the particular employment decision at issue was made on the basis of race. *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 714–715 [103 S.Ct. 1478, 1481–1482, 75 L.Ed.2d 403] (1983); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S., at 253 [101 S.Ct. at 1093]. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff regarding the particular employment decision "remains at all times with the plaintiff," *ibid.*, and in the final analysis the trier of fact "must decide which party's explanation of the employer's motivation it believes." *United States Postal Service Board of Governors v. Aikens*, 460 U.S., at 716 [103 S.Ct. at 1482].

*Cooper v. Federal Reserve Bank of Richmond*, 467 U.S. 867, 875, 104 S.Ct. 2794, 2799, 81 L.Ed.2d 718 (1984).

■ Ulysses January established that he belongs to a racial minority; that he applied for the position of superintendent; that he was denied the position; and that Stolaruk continued to seek applicants and hired a white applicant for the position. Ulysses January has not established that he was qualified for the position of superintendent in light of the experiences of Bob Peake and David Hurd and the needs of Stolaruk Corporation. Assuming, however, that January was qualified to be a superintendent, the defendant has presented several non-discriminatory reasons for not promoting January to the position. Defendant contends that January needed additional training on the operation of a transit, that January preferred to remain an hourly employee, and that January could not properly delegate work assignments and responsibilities to other crew members. January asserts that these reasons are pretextual because he knew how to operate a transit; Stolaruk Corporation paid hourly wages to David Hurd while he was a superintendent; and January had established that he could delegate responsibility in his years as a foreman.

Willie Salter established that he belongs to a racial minority; that he applied for the position of paver operator and was qualified to be a paver operator; that his request to be promoted was denied; and that after his rejection, the position remained open and was filled by a white applicant with Salter's qualifications. Stolaruk Corporation contends that the position was filled by individuals on an as-needed basis and required the individual to perform prep and conditioning, which Salter had refused to perform in the past. Salter contends that these reasons are pretextual because the position was not filled on an as-needed basis, but, rather, was a full-time position and because there is no evidence that Salter would have refused to be a paver operator on a prep and conditioning crew.

James Bell also established that he belongs to a racial minority; that he applied for the position as foreman and was qualified to be a foreman; that his request for the position was denied; and that the position remained open and was filled by a white applicant with Bell's qualifications. Stolaruk asserts that the only foreman po-

sitions available were on prep and conditioning crews and Bell had refused to perform prep and conditioning in the past. Bell claims that there is no evidence he would have refused to be a foreman on a prep and conditioning crew.

Stolaruk's decision to deny the plaintiffs' requests for promotions does not amount to discrimination under a theory of discriminatory treatment or under a theory of discriminatory impact.

Based on the evidence produced at trial, it is evident that the mainline paving crew, on which January, Salter, and Bell worked, was the best paving crew Stolaruk had ever employed. Their work was described as "flawless." They were capable of laying two thousand tons of asphalt in one day. No other group of employees had ever produced such results. The motivation behind Stolaruk's denial of the plaintiff's requests for promotions was to retain the best mainline paving crew in such capacity on a year-after-year basis—and he did. This action can be characterized as selfish, even ruthless, but has not been shown in any way to be racially motivated.

Stolaruk's actions did not result in a discriminatory impact on the plaintiffs. As to January, he was not qualified for the position of superintendent. As previously stated, he was not qualified to estimate and submit construction proposals and did not have the experience in an asphalt plant to qualify him to interact with aggregate sellers and county and state asphalt plant inspectors. As to Salter and Bell, Stolaruk did employ blacks in the position of paver operators and foremen. Bell was black and he was a paver operator. Further, the only two foremen in charge of mainline paving crews, Ulysses January and Charlie Monger, were both black. Therefore, the plaintiffs have failed to establish discriminatory impact because Stolaruk's employment practices do not fall more harshly on blacks than whites.

As to whether plaintiffs were paid lower wages because of their race, all three plaintiffs claim that they received lower wages than comparable white employees. The evidence, however, indicates that the plaintiffs were paid the wages required by the collective bargaining agreements and that their wages were within the governing scale. The hourly wages cited below are based on the Stolaruk Corporation Employee Master Listing, dated October 31, 1980.

Stolaruk employed Ulysses January as a foreman laborer and paid him $11.24 an hour. Stolaruk classified only two other individuals as foreman laborers. Charlie Monger, the only other foreman on a mainline paving crew, also earned $11.24 an hour. C.D. Jones, foreman of a conditioning and prep crew, was white and earned $13.08 an hour. Stolaruk asserts that Jones' wages increased due to a stipend to help him cover the cost of relocating to Texas, where Stolaruk had another paving business, and to compensate him for lost union benefits. January has provided no evidence to establish that this justification for the wage difference was pretextual.

As a screen man, Willie Salter earned $10.49 an hour. Stolaruk did not classify any other individuals as screen men; however, the collective bargaining agreement between the Labor Relations Division of the Michigan Road Builders Association and the Laborers' International Union lists a screen man's base rate of pay as $10.49 an hour. Further, the wage scale of other laborers at Stolaruk Corporation ranged from $4.50 an hour to $11.38 an hour. Most laborers earned $10.37 an hour. There is insufficient evidence to establish that Willie Salter, a screen man in the laborers union, who earned more money than most laborers, received lower wages than comparable white employees.

As an operator, James Bell earned $11.38 an hour. The pay scale for operators ranged from $8.00 an hour to $11.63 an hour. Most operators at Stolaruk earned either $11.25 or $11.38 an hour. There is insufficient evidence to establish that James Bell, an operator earning wages at the higher end of the pay scale for operators, received lower wages than comparable white employees.

In all the years covered by the evidence in this law suit, the long and dark shadow of one man, and only one, fell heavily on

the defendant corporation: Steven Stolaruk.

It was clear from the near-unanimous testimony—and an abundance of it, at that—Steven Stolaruk was always a foulmouthed, insensitive, ranting, raving and often unreasonable man given to driving his employees in a merciless, harassing manner—and indiscriminately so.

Whether it was a desire for perfection in performance, quality of work, or greed that drove Steven Stolaruk may never be known. But he was everywhere, doing everything, seemingly at all times. Steven Stolaruk was the defendant corporation; the defendant corporation was Steven Stolaruk. The witnesses made it clear that he was the only real boss, the only real superintendent, the only real working foreman with whom anyone was really concerned. Though Witek, Peake, Monger, plaintiff January, and perhaps Hurd to a lesser degree, had some aura of long-term authority in name, in practice Steven Stolaruk was the authority and all else were transitory in fact whether they knew it or not. All the evidence shows without a question that Steven Stolaruk made and thought little of titles and supervisory positions, for all were but an extension of his own complete domination of the asphalt paving business of the defendant corporation.

Steven Stolaruk came across as rather one dimensional, neither deep enough on the one hand or shallow enough on the other to be moved to action based on considerations of race, color, creed, sex, or national origin. This Court can find him to be many things, but a racist he was not as to these three plaintiffs. In twenty-one years with plaintiff January, fifteen years with plaintiff Salter, and twelve years with plaintiff Bell, for all his high-handed and obnoxious treatment of his employees, indiscriminately, nothing can be effectively shown that his animus towards these plaintiffs, or any other employees, was based on their race or color.

The retaliation claims in this case are yet another matter.

It is undisputed that Stolaruk Corporation, during the EEOC and MDCR proceedings, agreed that the three plaintiffs could continue working for the company and would be rehired in the ensuing season. Bill Wiebelhaus, on behalf of Stolaruk Corporation, notified the plaintiffs' attorney on April 8, 1981, that they could work for Stolaruk Corporation during the 1981 paving season. (See defendant's exhibit 148, memo of Bill Wiebelhaus). What is in part dispositive of the retaliation issue is how Stolaruk usually called the plaintiffs back to work each paving season; whether they were called back to work; and whether Stolaruk's actions constitute retaliation against the plaintiffs because of the grievances filed with the EEOC and the MDCR.

All three plaintiffs contend that every spring, at the start of a new paving season, either Steven Stolaruk or Hank Witek, superintendent of Stolaruk Corporation, would telephone Ulysses January and inform January when and where he was to report to work. January would then call his crew and relay the information. Charlie Monger, foreman of the other mainline paving crew, testified that this was the manner by which his crew as well would be called back each spring.

Early in the trial, Steven Stolaruk testified that when spring arrived most of his employees would go to the asphalt yard and inquire when they could begin working. He also testified that he did place phone calls to some of his employees and would call January at his home on many mornings as a usual course of business and notify him where he was to have his crew work that day. Later in the trial, however, Stolaruk testified that he did not call people back to work in the beginning of the paving season.

David Hurd testified that the employees would stop by the yard in the spring. Bob Peake also stated that the employees would go to the yard to determine when they would begin working.

Gary Ertman, Edward Barduca, Richard Markell, Jr., and Roger Harriman all testified that they would go to the asphalt yard each spring and ask when they could begin working. Roger Harriman also stated, however, that not everyone would go to the

yard because someone who lived far away would not make the trip for that limited purpose.

The Court finds that, in general, employees of Stolaruk Corporation would go to the yard at the start of each paving season and inquire as to when they could return to work. The Court also finds that January, Salter, Bell, and Monger did not adhere to this general policy. Based on past practices, January and Monger would wait for a telephone call from the corporation and would then inform their crew of when and where they were to report to work. This is established by Steven Stolaruk's own statements that he did place phone calls to some employees each spring and would call January on many mornings to notify him where his crew should report to work. Because calling January had become the practice for rehiring January and his crew, Stolaruk was obligated to continue the practice until he notified them that they should report to the yard like the rest of the employees. There is no evidence that he ever informed the plaintiffs that this procedure was no longer in effect.

Steven Stolaruk also testified that, after promising the plaintiffs they could continue working for Stolaruk Corporation, he called Ulysses January four to six times in May to notify him when and where to report to work. He also testified that he did not call Willie Salter or James Bell.

Ulysses January testified that during May and June of 1981, he did not receive any telephone calls from Stolaruk Corporation and that during that time, nine people who were living in his house could answer a telephone and take a message. January also testified that his father, Cary January, had worked for Stolaruk in the past; that Stolaruk had Cary's telephone number; that Cary lived below Ulysses; and that Cary did not receive any phone calls from Stolaruk Corporation during May and June of 1981.

The Court finds that neither Stolaruk Corporation, nor its agents, ever telephoned any of the plaintiffs during the 1981 paving season. Steven Stolaruk's testimony that he called January four to six times that season and received no answer is not worthy of belief. Stolaruk was able to telephone January each morning in the past to notify him where his crew was to report to work. Further, Stolaruk had the phone number of Ulysses' father, who lived below Ulysses. If Steven Stolaruk wanted to contact plaintiff January, it was within his means and ability, just as it had been for a great many years.

■ A plaintiff establishes a *prima facie* case of retaliatory discharge under 42 U.S.C. § 2000e–3(a) and M.C.L. § 37.2101 by proving that he was engaged in a protected activity, that he suffered adverse employment action by his employer, and that a causal link exists between the employer's adverse employment action and the plaintiff's protected activity. *Yates v. AVCO Corp.*, 819 F.2d 630, 638 (6th Cir. 1987). Once a *prima facie* case is established, the defendant has the burden of explaining his actions. Once an explanation is offered, the plaintiff has the burden of showing that the explanation is pretextual.

■ All three plaintiffs, January, Salter, and Bell, filed complaints with the EEOC and the MDCR. This constitutes protected activity. 42 U.S.C. § 2000e–3(a); M.C.L. § 37.2202. Stolaruk acted adversely toward them after their grievances were filed by promising them they could return to work in the spring of 1981, mailing them telegrams indicating anticipated start dates, and never calling them back to work. The Court finds that a causal relation exists between Stolaruk's adverse actions and the plaintiffs' charges of race discrimination with the EEOC and the MDCR. The plaintiffs each testified that they withdrew their charges with the agencies because of Stolaruk's promise to rehire them.

Stolaruk contends that the 1981 paving season was slow and that he needed only one mainline paving crew, and because Charlie Monger had more seniority as a mainline paving crew foreman, his crew was called back first. Stolaruk, however, was not required to offer the plaintiffs positions on paving crews. He could have provided them with positions on condition-

ing and prep crews; and there was an abundance of testimony that conditioning and prep crews were working steadily during the entire 1981 season.[1] Moreover, the evidence presented by plaintiffs indicates that there was some mainline paving being performed by conditioning and prep crews on an as-needed basis. Accordingly, the Court finds that Stolaruk's proffered reasons are not credible nor reasoned and constitute a pretext for retaliatory actions against the plaintiffs because of the charges they filed with the EEOC and the MDCR.

Ulysses January, Willie Salter, and James Bell, essential members of Stolaruk's best mainline paving crew, left something to be desired as to all-around proficiency. Although excellent mainline pavers, they provided Stolaruk Corporation with little else.

January managed to take as much from the corporation as he was entitled, perhaps something a bit more. He would include the drive time to and from his home on his time cards. This practice of recording time from portal to portal provided him each week with close to twenty hours more overtime pay than the rest of his crew. No other foreman was known to abuse his timecards to this extent. Moreover, he only stopped the practice after Witek and Stolaruk complained of its excessiveness.

Though disputed by plaintiffs, January, Salter and Bell generally refused to do any work that was not mainline paving. Other crews would perform whatever duties were required to complete a job. When January's crew would catch up to a conditioning crew that was preparing the next area to be paved, the plaintiffs would stand by their paving machines and watch, refusing to lend a hand, even when requested. According to them, they were mainline pavers —and only mainline pavers.

There was evidence to believe that at least plaintiff January may have moonlighted after hours, performing other paving jobs. The January crew would never stay late and help a conditioning crew finish a day's work. A reasonable inference from the evidence is that one or more of the plaintiff's had work of their own to do elsewhere.

This conduct, however, does not excuse Stolaruk's retaliatory acts. Title VII and the Elliott–Larsen Act were designed to free minorities from discrimination and to protect minorities when exercising their civil rights. Although the plaintiffs' claims of discrimination were groundless, they were entitled to file their charges without fear of reprisal. Steven Stolaruk violated this right when he offered empty promises in return for the withdrawal of their grievances. It is this act that this Court finds unjust.[2]

Steven Stolaruk sold his asphalt company in 1985. Therefore, the plaintiffs are only entitled to damages from 1981 through 1985. The Court determines a fair assessment of damages is the plaintiffs' average income for the last five years of their employment multiplied by five for the years 1981 through 1985, less what they earned in other employment.

Ulysses January earned $19,824 in 1976; $18,430 in 1977; $26,317 in 1978; $31,390 in 1979; and $17,905 in 1980, which is an average income of $22,773 and a total five-year income of $113,866. January earned no income in 1981 and 1982; $8,650 in 1983; $8,000 in 1984; and $12,150 in 1985, which is a total of $28,800. January's damages amount to $85,066.

While employed with Stolaruk Corporation, Willie Salter earned $13,740 in 1976; $12,696 in 1977; $16,307 in 1978; $19,661 in 1979; and $11,784 in 1980, which is an average income of $14,838 and a total five-year income of $74,188. Salter earned no

---

1. It is equally clear from the testimony and evidence in the case that these three plaintiffs and no others were recipients of "back to work telegrams"—as well as the fact that all other members of plaintiff January's paving crew were called back to the job in the spring of 1981 as early as anyone else on defendant's payroll: only these three plaintiffs received special and discriminatory treatment. It was clearly retaliation against them.

2. The retaliation claim of plaintiffs might have been couched in terms of breach of contract as well.

income from 1981 to 1983; $17,399 in 1984; and $21,175 in 1985, which is a total of $38,574. Salter's damages amount to $35,614.

James Bell, while employed with Stolaruk Corportion, earned $16,273 in 1976; $14,629 in 1977; $18,546 in 1978; $23,937 in 1979; and $12,619 in 1980, which is an average income of $17,201 and a total five-year income of $86,005. Bell earned no income in 1981 and 1982; $10,365 in 1983; $22,066 in 1984; and $22,082 in 1985, which is a total of $54,513. Bell's damages amount to $31,492.

SO ORDERED.