FARMINGTON EDUCATION ASSOCIATION v FARMINGTON
SCHOOL DISTRICT

Docket No. 67038. Submitted October 6, 1983, at Lansing.—Decided
    April 3, 1984.

The Farmington Education Association negotiated an employ-
    ment contract for its membership with the Farmington School
    District. The contract provided that those teachers who re-
    ceived hospitalization insurance coverage from an outside
    source would not be covered by the hospitalization plan pro-
    vided by the school district but would receive certain other
    fringe benefits. The association, on behalf of certain members,
    brought an action against the school district in the Oakland
    Circuit Court, alleging that the provision violated the Elliott-
    Larsen Civil Rights Act. The parties stipulated that the provi-
    sion saves considerable money which is used for increased
    employee benefits and improved school programs. The court,
    Robert L. Templin, J., granted summary judgment for defen-
    dant. Plaintiff appealed. *Held:*

A plaintiff may prevail in a suit alleging employment dis-
    crimination under the Elliott-Larsen Civil Rights Act by proof
    of either disparate treatment or disparate impact, that is, by
    proof of either a) discriminatory motives, or b) practices which,
    while facially neutral, have harsher effects on one group than
    another and cannot be justified by business necessity. Inclusion
    of the no double coverage provision in the contract did not
    violate the Elliott-Larsen Civil Rights Act.

Affirmed.

1. CIVIL RIGHTS — DISPARATE TREATMENT — DISPARATE IMPACT —
    EMPLOYMENT DISCRIMINATION.

A plaintiff may prevail in a suit alleging employment discrimina-
    tion under the Elliott-Larsen Civil Rights Act by proof of either
    disparate treatment or disparate impact, that is, by proof of

REFERENCES FOR POINTS IN HEADNOTES
[1] 15 Am Jur 2d, Civil Rights § 103 *et seq.*
Racial discrimination in labor and employment—Supreme Court
    cases. 28 L Ed 2d 928.
[2] 15 Am Jur 2d, Civil Rights § 102.

either a) discriminatory motives, or b) practices which, while facially neutral, have harsher effects on one group than another and cannot be justified by business necessity (MCL 37.2101 *et seq.;* MSA 3.548[101] *et seq.).*

2. Civil Rights — Elliott-Larsen Civil Rights Act.

The Elliott-Larsen Civil Rights Act is meant to proscribe only a discriminatory preference for any group, majority or minority (MCL 37.2101 *et seq.;* MSA 3.548[101] *et seq.).*

*Mary Hannorah Job,* for plaintiff.

*Clark, Hardy, Lewis, Pollard & Page, P.C.* (by *Richard M. Tuyn),* for defendant.

Amicus Curiae:

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Felix E. League* and *Dianne Rubin,* Assistants Attorney General, for Department of Civil Rights.

Before: Allen, P.J., and Beasley and M. E. Clements,* JJ.

Per Curiam. Plaintiffs appeal as of right from an order entered in the Oakland County Circuit Court which granted defendant's motion for summary judgment and denied plaintiffs' motion for summary judgment.[1]

---

* Circuit judge, sitting on the Court of Appeals by assignment.

[1] Although the parties denoted their motions as being for summary judgment, defendant contends that the parties really submitted this dispute under the agreement on the case provisions of GCR 1963, 111.10, and this is not disputed by plaintiffs. This is consistent with the parties' presentation of arguments before the circuit court. The attorneys for both parties considered the settled record to set the factual boundaries of this dispute. Neither party argued that it might not be possible for the lower court to grant summary judgment on the stipulated record because disputes existed over other facts which, depending on what the court deemed significant, needed to be developed before judgment could enter. We do not believe that the standard for reviewing summary judgment motions pursuant to GCR 1963, 117.2(3) is applicable here or, if it is, that, in light of this

At issue is whether the parties' collective-bargaining agreement discriminates on the basis of marital status or sex, contrary to the Elliott-Larsen Civil Rights Act, MCL 37.2101 *et seq.;* MSA 3.548(101) *et seq.,* or violates the public policy of the State of Michigan by denying hospitalization insurance to teachers who receive such insurance from other sources. This case comes to us on a , stipulated record, and the pertinent facts will be briefly set forth.

The 1981-1983 collective-bargaining agreement between the parties contains a clause which provides for "no double coverage" with respect to hospitalization insurance. This provision precludes any teacher who receives hospitalization coverage from an outside source from receiving "MESSA Super Med II Hospitalization Coverage" (hereinafter Super Med II) which the parties agree is "the best insurance coverage". Those teachers ineligible for hospitalization insurance through the school district receive an additional $5,000 life insurance benefit plus $240 payable as additional salary in a tax deferred annuity or available to purchase MESSA variable insurance options or a combination of both.

Of the 697 teachers employed by defendant, 126 teachers were denied their own Super Med II policies due to insurance coverage through other sources. All but five of these teachers are married females. However, 31 of the 121 married female teachers ineligible for their own Super Med II policies continue to receive Super Med II coverage as dependents on their teacher-spouse's Super Med II policy. In addition, 40 teachers eligible for insurance elsewhere dropped some portion of this cover-

stipulated record, either party may now claim that it wants to present additional facts.

age, but still do not insure one or more dependents on the insurance available through defendant. All 40 of these teachers are female, and all but 2 of these teachers are married. Finally, 115 teachers eligible for insurance for themselves and their families elsewhere simply discontinued this coverage and are now covered exclusively by Super Med II offered through the school district. Of these 115 teachers, 81 are married females; 31 are married males, and 3 are single males.

The parties stipulate that the inclusion of the no double coverage provision in their collective-bargaining agreement saves the school district a considerable sum of money over any savings realized from a typical "coordination of benefits" provision in the policy of insurance itself. Considering only the 126 teachers who were completely denied their own Super Med II policies, assuming that all of these employees could and would elect full family Super Med II coverage, defendant would have to pay an additional $312,984 per year in premiums. The current cost of the additional compensation for teachers ineligible for their own Super Med II policies is $31,449. Thus, under the parties' assumptions, $281,535 is saved by defendant through the "no double coverage" provision in the collective-bargaining agreement.[2] The parties stipulate that this savings is used for "increased employee benefits and improved school programs".

Individual plaintiffs Buckler and Hammar testi-

[2] In fact, the assumption that all 126 teachers would elect full family Super Med II coverage if they had this choice is highly dubious. First, it is highly unlikely that all 126 of these teachers are married with children. Second, it is highly unlikely that at least some of these teachers would not elect to obtain the alternative hospitalization coverage offered by defendant in lieu of an additional hospitalization insurance policy which contains a coordination of benefits provision. The value to the teacher of an additional hospitalization insurance policy will be negligible except, perhaps, for the most heavy users of medical services.

fied at depositions that they could not be dropped from a spouse's hospitalization insurance policy. Buckler contended that she was so informed by a representative of her spouse's employer. Hammar supported his contention with a letter from his spouse's employer's insurer which indicated that neither he nor his wife could drop the insurance coverage provided by his spouse's employer. Individual plaintiff McCracken filed an affidavit which stated that she could not drop the hospitalization coverage offered by her spouse's employer. Individual plaintiff Haun testified that she withdrew from her spouse's insurance plan, but that certain medical expenses resulting from a pregnancy, which were not covered by Super Med II, would have been covered by her spouse's policy had she not been required to drop the coverage.

Section 202 of the Elliott-Larsen Civil Rights Act, MCL 37.2202; MSA 3.548(202), provides in pertinent part:

"Sec. 202. (1) An employer shall not:

"(a) Fail or refuse to hire, or recruit, or discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status.

"(b) Limit, segregate, or classify an employee or applicant for employment in a way which deprives or tends to deprive the employee or applicant of an employment opportunity, or otherwise adversely affects the status of an employee or applicant because of religion, race, color, national origin, age, sex, height, weight, or marital status.

"(c) Segregate, classify, or otherwise discriminate against a person on the basis of sex with respect to a term, condition, or privilege of employment, including a benefit plan or system."

Section 202 of the Elliott-Larsen Civil Rights Act is modeled after § 703 of Title VII of the Civil Rights Act of 1964, 42 USC 2000e-2. Two theories of recovery have been recognized under Title VII by the federal courts, namely, "disparate treatment" and "disparate impact". *International Brotherhood of Teamsters v United States,* 431 US 324, 335-336, fn 15; 97 S Ct 1843; 52 L Ed 2d 396 (1977), the Supreme Court explained the differences between these twin theories of recovery as follows:

" 'Disparate treatment' such as is alleged in the present case is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment. See, *e.g., Arlington Heights v Metropolitan Housing Dev Corp,* 429 US 252, 265-266. Undoubtedly disparate treatment was the most obvious evil Congress had in mind when it enacted Title VII. See, *e.g.,* 110 Cong Rec 13088 (1964) (remarks of Sen. Humphrey) ('What the bill does * * * is simply to make it an illegal practice to use race as a factor in denying employment. It provides that men and women shall be employed on the basis of their qualifications, not as Catholic citizens, not as Protestant citizens, not as Jewish citizens, not as colored citizens, but as citizens of the United States').

"Claims of disparate treatment may be distinguished from claims that stress 'disparate impact.' The latter involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. See *infra,* at 349. Proof of discriminatory motive, we have held, is not required under a disparate impact theory. Compare, *e.g., Griggs v Duke Power Co,* 401 US 424, 430-432, with *McDonnell Douglas Corp v Green,* 411 US 792, 802-806. See generally B. Schlei & P. Grossman, Employment

Discrimination Law 1-12 (1976); Blumrosen, Strangers in Paradise: *Griggs v Duke Power Co* and the Concept of Employment Discrimination, 71 Mich L Rev 59 (1972). Either theory may, of course, be applied to a particular set of facts."

This Court has specifically recognized a "disparate treatment" theory of the case under the Elliott-Larsen Civil Rights Act. *Schipani v Ford Motor Co,* 102 Mich App 606, 617; 302 NW2d 307 (1981). Under a disparate treatment theory, plaintiffs must make a showing that defendant had a discriminatory motive to establish a prima facie case. *McDonnell Douglas Corp v Green,* 411 US 792, 802-806; 98 S Ct 1817; 36 L Ed 2d 668 (1973).

In this case, plaintiffs' complaint fails to allege that defendant acted with a discriminatory motive in bargaining for, and incorporating into, the parties' collective-bargaining agreement the no double coverage clause. Moreover, the parties' stipulation of facts and the various depositions and affidavits filed in this case fail to reveal any such discriminatory purpose. In fact, the parties stipulated that the purpose of the no double coverage clause was to obtain savings to be used to "increase employee benefits and improve school programs". We note also that defendant did not impose the no double coverage provision on the plaintiffs but, rather, the provision was negotiated by defendant and the plaintiff educational association during the process of collective bargaining. These facts preclude a finding that defendant acted with a discriminatory purpose.

We now consider plaintiffs disparate impact theory, *i.e.,* that a facially neutral employment practice burdens the protected classes of women and married persons more harshly than others. To prevail on such a theory, discriminatory motive

need not be proven. *Teamsters v United States, supra.* Before turning to the merits of this theory, however, we first address defendant's contention that Michigan should not recognize a disparate impact theory of recovery under the Elliott-Larsen Civil Rights Act.

Although there currently exist no holdings by the Michigan appellate courts which embrace the disparate impact theory, for several reasons we believe that this theory is available to litigants pressing claims under the Elliott-Larsen Civil Rights Act. First, while the Michigan courts are not compelled to construe the act in accord with the construction given Title VII,[3] thus far, where they have failed to follow federal precedents under Title VII, they have concluded that the state act provides greater rights to aggrieved litigants. See, *inter alia, Northville Public Schools v Civil Rights Comm,* 118 Mich App 573, 576-577; 325 NW2d 497 (1982); *Dep't of Civil Rights ex rel Jones v Dep't of Civil Service,* 101 Mich App 295; 301 NW2d 12 (1980). Second, there are indications that the Michigan Supreme Court will hold that a disparate impact theory may be advanced under the Elliott-Larsen Civil Rigths Act. In separate opinions in *Dep't of Civil Rights ex rel Parks v General Motors Corp,* 412 Mich 610, 622, 646-648; 317 NW2d

---

[3] Generally, when the Michigan Legislature models legislation after the existing statute of another jurisdiction, as a rule of construction intended to aid in discovering legislative intent, it is presumed that the Legislature intended to adopt any construction placed upon the statute by the courts of the jurisdiction from which that statute was taken. See, *e.g., Cleveland-Cliffs Iron Co v First State Ins Co,* 105 Mich App 487, 493-494; 307 NW2d 78 (1981). This Court has implicitly adopted this rule of construction in a number of decisions involving the Elliott-Larsen Civil Rights Act or its less comprehensive precursor, the Fair Employment Practices Act, MCL 423.301 *et seq.;* MSA 17.458(1) *et seq.* See, *inter alia, Clark v Uniroyal Corp,* 119 Mich App 820; 327 NW2d 372 (1982); *Bouwman v Chrysler Corp,* 114 Mich App 670; 319 NW2d 621 (1982); *Gallaway v Chrysler Corp,* 105 Mich App 1; 306 NW2d 368 (1981).

16 (1982), four justices strongly indicated that, in a proper case brought under the Fair Employment Practices Act, MCL 423.301 *et seq.;* MSA 17.458(1) *et seq.,* now replaced by the more comprehensive Elliott-Larsen Civil Rights Act, a disparate impact theory would be appropriate. Third, the Michigan Civil Rights Commission adopted interpretive guidelines in 1972 which recognize the theory of disparate impact. Although these guidelines are not conclusive, this Court has recognized that they are entitled to careful consideration and has found them persuasive in the past. *Dep't of Civil Rights v Dep't of Civil Service, supra,* p 303.[4] Fourth, defendant advances no compelling reasons, based either on policy or presumed legislative intent, to reject the disparate impact analysis.

Defendants further assert that, even if disparate impact analysis is appropriate under the Elliott-Larsen Civil Rights Act, because the United States Supreme Court has never used this analysis in a case involving an alleged violation of § 703(a)(1) of Title VII (pertaining to "compensation, terms, conditions, or privileges of employment") but, rather, only to § 703(a)(2) violations (pertaining to "employment opportunities or * * * status as an employee"), that it should be deemed inapplicable in Michigan except to employment status cases. The United States Supreme Court has reserved the issue of whether it will recognize disparate impact analysis in cases involving fringe benefits. *City of Los Angeles, Dep't of Water & Power v Manhart,*

---

[4] This flows from the rule of construction that an administrative body's interpretation of the statute which it is charged with administering is entitled to great weight when attempting to ascertain legislative intent. See, *inter alia, Jerome v Crime Victims Compensation Bd,* 119 Mich App 648, 653; 326 NW2d 593 (1982); *Szabo v Ins Comm'r,* 99 Mich App 596, 598; 299 NW2d 364 (1980); *Artman v College Heights Mobile Park, Inc,* 20 Mich App 193, 198; 173 NW2d 833 (1969).

435 US 702, 710, fn 20; 98 S Ct 1370; 55 L Ed 2d 657 (1978); *Nashville Gas Co v Satty,* 434 US 136, 144-145; 98 S Ct 347; 54 L Ed 2d 356 (1977). At the same time, however, the United States Supreme Court has never disapproved the use of the disparate impact model in fringe benefit cases, and some federal decisions have concluded that such analysis is appropriate. See, *e.g., Wambheim v J C Penney Co, Inc,* 705 F2d 1492, 1494 (CA 9, 1983). Given the liberal construction of this state's civil rights statutes heretofore adopted by the appellate courts, we choose to follow the federal decisions which apply disparate impact analysis to fringe benefit cases when it has been pled.

The circuit court concluded that an "employment opportunity" as used within the meaning of MCL 37.2202(1)(b); MSA 3.548(202)(1)(b) did not encompass fringe benefits such as hospitalization insurance and, thus, found for defendant. We need not devote extensive analysis to this issue because, regardless of the meaning to be accorded the term "employment opportunity", we find that MCL 37.2202(1)(a); MSA 3.548(202)(1)(a), which prohibits any discrimination against an individual with respect to "compensation or a term, condition, or privilege of employment" because of, among others, sex and marital status, is applicable here. Whether or not the ability to obtain hospitalization insurance is an "employment opportunity", it certainly is encompassed as "compensation or a term, condition, or privilege of employment".

We now turn to the merits of plaintiffs' claims of disparate impact. We initially note that a completely neutral practice will always have a disproportionate impact on some group, and discrimination need not always be inferred from such consequences. *City of Los Angeles, Dep't of Water &*

*Power v Manhart, supra.* We are ultimately persuaded that plaintiffs have failed to prove that they are "burdened" within the meaning of disparate impact analysis as a consequence of defendant's actions.

In *Griggs v Duke Power Co,* 401 US 424, 431; 91 S Ct 849; 28 L Ed 2d 158 (1971), the Supreme Court noted that "[d]iscriminatory preference, for any group, majority or minority, is precisely and only what Congress has proscribed". In our view, this observation is equally applicable to the Elliott-Larsen Civil Rights Act. On the facts of this case, we are simply unable to conclude that the parties' no double coverage provision in their collective-bargaining agreement operates to create a preference for males and single persons. It is crucial to our analysis that any teacher employed by defendant has an absolute right under the parties' contract to elect to obtain Super Med II coverage by dropping other hospitalization coverage.[5] The element of a choice between reasonable options given to the individual employee precludes a determination that defendant's actions invidiously burden either women or married teachers.[6] To illus-

[5] In fact, plaintiffs did tend to prove that three of the four named plaintiffs could not elect to be covered by Super Med II because of a spouse's employer's employment practices. We do not consider defendant to be responsible for the employment practices of other employers. Because none of these employers are parties to this suit, we need not express an opinion on the question of whether an employer which forces its employee's spouse to accept unwanted hospitalization insurance discriminates on the basis of marital status within the meaning of the Elliott-Larsen Civil Rights Act.

[6] When we are considering married teachers, the choice offered by defendant is, of course, actually a decision to be made jointly with a spouse. Conceivably, an employee of defendant could be thwarted in her desire to elect Super Med II because her spouse refuses to cooperate with her by dropping her from the hospitalization insurance offered through his employer. To the extent that this actually is a problem for any of the plaintiffs, we simply do not believe that the Elliott-Larsen Civil Rights Act was intended to provide protection from the unwillingness of a spouse to cooperate with his partner.

trate the importance of reasonable choice to our analysis, the present scenario may be distinguished from a contractual provision which, for instance, denies hospitalization insurance to any employee who has hospitalization insurance available through another person's employer's group hospitalization plan, whether or not that employee in fact carries this hospitalization insurance or even wants it. In this hypothetical scenario, where a married employee would have no opportunity to elect hospitalization insurance offered by her employer simply because her husband had such insurance available for her through his employer, the married employee might well be found to be unfairly burdened by a seemingly neutral employment practice.

Although the question of disparate impact in fringe benefits has not been extensively addressed by the federal courts, at least one district court has employed an analysis which focuses on the element of choice which we find significant in concluding that no disparate impact has been proven here. In *United Independent Flight Officers, Inc v United Air Lines, Inc,* 572 F Supp 1494, 1506 (ND Ill, 1983), the court rejected plaintiffs' disparate impact age discrimination theory, holding that plaintiff pilots were not unfavorably situated because of their ages but, rather, because they had voluntarily chosen not to contribute to the pilots' pension plan before defendant undertook complete funding of the plan in 1965. Similarly, the teachers in this case, to the extent that they can be deemed unfavorably situated, are not burdened by the actions of defendant, but, for the most part, because they voluntarily made choices from among various reasonable options made available by defendant.

Plaintiffs also contend that the no double coverage provision contravenes the public policy of this state as expressed in the married women's property act, MCL 557.24; MSA 26.165(4), and §§ 3436, 3438, and 3440 of the Insurance Code of 1956, MCL 500.100 *et seq.;* MSA 24.1100 *et seq.,* which permit coordination of benefits provisions in insurance policies. We find that the cited statutory provisions are simply inapplicable to the no double coverage provision contained in the parties' collective-bargaining agreement.

Affirmed. No costs, a public question concerning the proper construction to be given a statute of critical significance to this case.