Thomas **HAGEN**, Plaintiff,

v.

**HOWMET CORPORATION**, Defendant.

Jack **STURTEVANT**, Plaintiff,

v.

**HOWMET CORPORATION**, a Delaware corporation, Defendant.

Nos. 1:93–CV–234, 1:93–CV–199.

United States District Court,
W.D. Michigan, S.D.

Jan. 3, 1994.

Timothy J. Bott, Bott & Spencer, PC, Muskegon, MI, for Hagen.

David A. Rhem, Paul M. Kara, Varnum, Riddering, Schmidt & Howlett, Grand Rapids, MI, for Howmet Corp. in No. 1:93–CV–234.

Timothy J. Bott, Richard D. McCormick, Bott & Spencer, PC, Muskegon, MI, for Sturtevant.

David A. Rhem, Paul M. Kara, Varnum, Riddering, Schmidt & Howlett, Grand Rapids, MI, for Howmet Corp. and Kline in No. 1:93–CV–199.

## OPINION

QUIST, District Judge.

Thomas Hagen and Jack Sturtevant, the plaintiffs in these two consolidated cases, claim that defendant Howmet Corporation (Howmet) wrongfully terminated their employment and discriminated against them based upon their age. This matter is before the Court on defendant's motions for summary judgment against each plaintiff.

### Statement of Facts

Howmet Corporation has a high technology foundry operation in Whitehall, Michigan, which manufactures components for the military and commercial aircraft industry. Howmet claims that military spending cuts and poor business conditions in the commercial airline industry forced it to significantly reduce its workforce in the early 1990's. The plaintiffs were laid off during Howmet's reduction in force (RIF). The facts as they relate specifically to each of the plaintiffs are outlined below.

### Thomas Hagen

Plaintiff Thomas Hagen is a forty-four (44) year old man who has been an employee of the Howmet Corporation on four occasions between 1968 and 1991. His initial employment at Howmet was during the summer of 1968. In April of 1973, Mr. Hagen returned to Howmet as a salaried employee. He was given a company handbook entitled "YOUR FUTURE WITH HOWMET." The handbook contained the following language which, according the Mr. Hagen, specifically promised that his employment would be terminated only for just cause:

> No employee will be terminated without proper cause or reason and not until management has made a careful review of all facts.

1973 Handbook at p. 9. The handbook also described a progressive discipline procedure, a probationary period, and specific grounds for discharge. The last page of the handbook, however, stated that it did not constitute a contract:

> The contents of this booklet are not intended to establish, and should not be interpreted to constitute any contract between the Misco Whitehall Division, Product Support Operations, Reactive Metal Operations or the Technical Center of Howmet Turbine Components Corporation and any employee, or group of employees.

1973 Handbook at p. 9.

Mr. Hagen worked at Howmet from 1973 until September of 1976. In 1976, he returned to college to complete his mechanical engineering degree. He returned to Howmet for the third time in January of 1980 and remained there until October of 1984, when he took a job with Kaydon Corporation. In September, 1986, Mr. Hagen was again re-hired at Howmet. At that time, he completed an Application For Employment which contained the following language:

> I understand that in the event I am hired and in the absence of a written agreement to the contrary, *my status will be that of an employee at will,* with no contractual right, express or implied, to remain in the Company's employ. In consideration of my employment, *I specifically agree that my employment may be terminated, with or without cause or notice, at any time,* at the option of either the Company or myself. I understand that no unauthorized

representative may enter any agreement for employment or make any agreement contrary to the foregoing.

Application For Employment at p. 3 (emphasis added). Mr. Hagen's signature appears just below the "at will" language quoted above.

At the time of his 1986 rehire, Mr. Hagen also signed a document acknowledging that he had received the handbook "YOUR FUTURE WITH HOWMET." The handbook distributed in 1986 did not state that employees would be terminated only for cause. Rather, it contained the following language:

> The company reserves the right to terminate employees without assigning cause; therefore, the employee serves at the will of the employer.

1986 Handbook at p. 9. The affidavit of Ms. Joyce McClure, the individual responsible for processing new hires, states that she provided Mr. Hagen with the employee handbook in 1986. Mr. Hagen contends that he never received a new handbook when he returned to Howmet in 1986. According to his affidavit, he signed some personnel records but the procedure was accomplished hurriedly and without a thorough review of the contents of the documents. He cites the affidavit of Nancy Johnson, Howmet's employment manager. She states that during a period of time in 1986, Howmet ran out of new handbooks and was unable to distribute them to the new employees. She thinks this period coincided with the time Mr. Hagen was rehired. However, Mr. William Roof, Howmet's director of Human Resources, has testified that although there was a period of time in the 1980's when Howmet ran out of printed copies of the handbooks, the handbooks were duplicated so that they were always available for distribution.

Mr. Hagen contends that, even if he did receive a new handbook, there is a factual dispute as to whether he had a legitimate expectation that his employment with Howmet would be terminated only for good cause. He bases this expectation on the promises contained in the 1973 Handbook and alleges that he received no notification that the company was changing to an at-will termination policy. He claims he received a mixed message as to whether he had a legitimate expectation of secure employment.

Mr. Hagen also challenges Howmet's assertion that his termination resulted from a necessary reduction in force. Mr. Hagen alleges that during the time period in which Howmet claims it was economically necessary to reduce its workforce, the company was experiencing a steady increase in corporate net worth and retained earnings and thus the claimed reduction in force was a pretext for terminating him. In support of this position, he offers the affidavit of an economist, William D. King, Ph.D. Howmet points out that Mr. Hagen acknowledged that he was terminated because the project on which he worked within the Foundry Technology group was eliminated and the group was redirected from equipment to metallurgical development. Howmet also objects that an assessment of its overall health is irrelevant when there is a bona fide economic reason for termination in the particular divisions in which plaintiffs were employed.

Mr. Hagen also alleges that he has demonstrated a prima facie case of age discrimination. According to Mr. Hagen, he was a member of a protected class and was a competent employee. After his termination he was replaced by a younger individual, Chris Hanslits. Howmet alleges that Mr. Hanslits did not replace Mr. Hagen, who was a *mechanical* engineer. Instead, Mr. Hanslits filled a *metallurgical* engineering position in the Foundry Research group.

Finally, with the support of Dr. King's affidavit, Mr. Hagen argues that Howmet's reduction in force resulted in a disparate impact on older employees. Howmet counters with computations which show that the average age of salaried employees terminated in the RIF was younger that the average age of salaried employees in the workforce at that time.

### Jack Sturtevant

Mr. Sturtevant was employed by Howmet on two occasions. He was initially employed in January of 1967. In 1973, he received the employee handbook entitled "YOUR FUTURE WITH HOWMET" which contained

language indicating that no employee would be terminated without proper cause. However, the handbook also stated that it did not constitute a contract.[1] On July 15, 1977, Mr. Sturtevant quit his job with Howmet. He was rehired on February 2, 1981. There is no allegation that he received a copy of the 1986 handbook. His employment was terminated in July of 1990 due to an alleged reduction in force. At the time of his termination, Mr. Sturtevant was forty-seven (47) years old.

For several years prior to his termination, Mr. Sturtevant was an assistant supervisor for the third shift at Howmet's Ti–Cast Division. He reported to Ken Riddle, the first shift general foreman. At the time of Mr. Sturtevant's termination, Mr. Riddle was sixty (60) years old. Approximately one year prior to his termination, Mr. Sturtevant was offered the opportunity to move from third shift to a comparable position as assistant supervisor on day shift. He declined the offer. At that time, the other assistant supervisors were John Cregg and Don Mahoney who were then ages forty nine (49) and fifty seven (57) respectively. Mr. Mahoney accepted the offer to work the day shift.

In July of 1990, Mr. Sturtevant's employment was terminated when the workforce was consolidated into two shifts and the third shift was eliminated. Michael Malady, Howmet's Director of Human Resources, has testified that Mr. Sturtevant's termination resulted from a downturn in business. In 1990, the number of Ti–Cast employees dropped from 218 to 151.

Mr. Sturtevant submitted the affidavit of Nancy Johnson, Howmet's Human Resources Specialist for a time. She stated that Howmet classified employees as non-exempt and exempt[2] and that Howmet's policy had always been not to terminate non-exempt employees during periods of economic downturn. Instead, the company would lay them off for six months and give them an opportunity to transfer to another position within the company. If a transfer did not materialize within the six month period, the non-exempt employee would then be terminated. Mr. Sturtevant was a non-exempt employee. He contends that Howmet failed to follow its customary practices with respect to non-exempt employees and discriminated against him on the basis of age when it immediately terminated him and failed to transfer him into available technician positions which less senior employees were permitted to fill. Howmet contends that it was their policy to lay off non-exempt employees only when they anticipated the employee would be called back within six (6) months. When the company was undergoing a reduction in force and did not anticipate recalling the employee, that employee would be classified terminated/RIF and given severance pay.

In support of his claim that there was a disparate impact on the protected class of employees during the period when Howmet's workforce was reduced, Mr. Sturtevant cites Dr. King's affidavit. He also offers Ms. Johnson's affidavit. Ms. Johnson states that Howmet expanded its workforce between 1984 and 1987, culminating with the addition of 1300 new employees in December of 1987. The month immediately following the marked expansion, Howmet began reducing its force and terminated many of its long-term employees. Ms. Johnson suspects that the hiring program was an artificial ballooning of the employment population which enabled Howmet to terminate its older employees. Mr. Sturtevant also argues, as did Mr. Hagen, that Howmet's reduction in force was pretextual in nature and that in reality Howmet was economically healthy.

### Legal Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56. The rule requires that the disputed facts be material. Material facts are facts which are defined by substantive law and are necessary

---

1. For the exact language of pertinent paragraphs of the handbook issued by Howmet in 1973 see page 2, *supra*.

2. Exempt salaried employees were paid a salary without regard to the number of hours they worked. Non-exempt salaried employees were paid for their overtime in addition to their salary.

to apply the law. A dispute over trivial facts which are not necessary in order to apply the substantive law does not prevent the granting of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The rule also requires the dispute to be genuine. A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.* This standard requires the non-moving party to present more than a scintilla of evidence to defeat the motion. The summary judgment standard mirrors the standard for a directed verdict. The only difference between the two is procedural. Summary judgment is made based on documentary evidence before trial, and directed verdict is made based on evidence submitted at trial. 477 U.S. at 250–51, 106 S.Ct. at 2511.

A moving party who does not have the burden of proof at trial may properly support a motion for summary judgment by showing the court that there is no evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). If the motion is so supported, the party opposing the motion must then demonstrate with "concrete evidence" that there is a genuine issue of material fact for trial. *Id.; Frank v. D'Ambrosi*, 4 F.3d 1378, 1384 (6th Cir.1993). The court must draw all inferences in a light most favorable to the non-moving party, but the court may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Financial Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir.1992) (quoting *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

### Wrongful Discharge

The established law in Michigan is that an employment contract for an indefinite period of time is "presumptively terminable at the will of either party for any reason or for no reason at all." *Rood v. General Dynamics Corp.*, 444 Mich. 107, 116, 507 N.W.2d 591, 597 (1993) (citing *Lynas v. Maxwell Farms*, 279 Mich. 684, 273 N.W. 315 (1937)). In *Toussaint v. Blue Cross & Blue Shield*, 408 Mich. 579, 610, 292 N.W.2d 880, 890 (1980), the Michigan Supreme Court recognized an exception to the established rule. The Court stated that "an employer's express agreement to terminate only for cause, or statements of company policy and procedure to that effect, can give rise to rights enforceable in contract." *Toussaint* held only that, if an employer agrees to discharge an employee solely for just cause, or promulgates policy statements to that effect, the employer's promise will be enforceable:

> *Toussaint* makes employment contracts which provide that an employee will not be dismissed except for cause enforceable in the same manner as other contracts. It did not recognize employment as a fundamental right or create a new "special" right. The only right held in *Toussaint* to be enforceable was the right that arose out of the promise not to terminate except for cause.

*Valentine v. General American Credit, Inc.*, 420 Mich. 256, 258, 362 N.W.2d 628, 629 (1984). In fact, the *Toussaint* court specifically noted that the employment relationship will be presumed to the terminable at will absent a showing of an agreement to the contrary. "Because the parties began with complete freedom, the court will presume that they intended to obligate themselves to a relationship at will." 408 Mich. at 600, 292 N.W.2d at 885.

In *Rood*, the Michigan Supreme Court stated that, "[t]o overcome the presumption of employment at will, a party must present sufficient proof either of a contractual provision for a definite term of employment or a provision forbidding discharge absent just cause." 444 Mich. at 117, 507 N.W.2d at 597 (citing *Rowe v. Montgomery Ward & Co.*, 437 Mich. 627, 636–37, 473 N.W.2d 268 (1991)). In these consolidated actions, both plaintiffs claim that there is a provision in Howmet's handbook forbidding discharge absent just cause. The *Rood* court explained that such a provision may become part of the employment relationship in one of two ways: under a contract theory, as a result of explicit promises or promises implied in fact, or un-

der a theory grounded in public policy considerations, if the employer's "policies and procedures instill 'legitimate expectations' of job security in employees." 444 Mich. at 117–18, 507 N.W.2d at 598. Plaintiffs in the instant actions claim they had "legitimate expectations" of just-cause employment. The *Rood* court instructed trial courts to analyze claims brought under the legitimate expectations theory of *Toussaint* as follows:

> [E]xamine employer policy statements, concerning employee discharge, if any, to determine, as a threshold matter, whether such policies are reasonably capable of being interpreted as promises of just-cause employment. If the employer policies are incapable of such interpretation, then the court should dismiss the plaintiff's complaint on defendant's motion for summary disposition.

*Id.* at 140, 507 N.W.2d at 607.

### Thomas Hagen

█ In this case, Mr. Hagen contends that Howmet's 1973 Handbook gave him a legitimate expectation that his employment could be terminated only for good cause. He argues that Howmet's failure to provide him with a copy of the 1986 Handbook or to specifically inform him that the company has changed its policy to at-will employment resulted in "mixed signals" and that the issue of whether Mr. Hagen had a just cause employment contract should thus go to the jury. This Court finds, however, that even if at some point in time Mr. Hagen's expectations regarding his employment status were legitimate, they were necessarily extinguished when he was reemployed by Howmet in 1986. At that time, he signed an employment application stating: "I understand that in the event I am hired, and in the absence of a written agreement to the contrary, my status will be that of an employee at will."

In Michigan the law is clear that such a signed agreement nullifies any previous understanding. An employee cannot reasonably expect to be terminable only for good cause once the employer indicates that the employment relationship is terminable at will. *Dell v. Montgomery Ward & Co.*, 811 F.2d 970 (6th Cir.1987); *Scholz v. Montgom-*

*ery Ward & Co.*, 437 Mich. 83, 468 N.W.2d 845 (1991); *In re Certified Question*, 432 Mich. 438, 457, 443 N.W.2d 112 (1989).

In cases factually similar to this one, courts have refused to find that a plaintiff's employment was terminable only for cause. In *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453 (6th Cir.1986), plaintiffs had signed an at-will employment agreement with Sears. They claimed that the employee handbook and discipline policies gave rise to a just cause employment agreement. The court disagreed. It held that the list of activities that could result in termination did not vitiate the express "at-will" employment contract and did not provide plaintiffs with a reasonable basis for concluding that they were employed under a just cause contract. *Id.* at 460.

In *Pratt v. Division of John Brown, Inc.*, 855 F.2d 1225 (6th Cir.1988), plaintiff argued that he had a legitimate expectation that the company would not discharge him without cause. Plaintiff had received oral assurances that he would not be fired without just cause. In addition, an employee handbook contained a section on progressive corrective discipline. The corrective handbook also contained a tear-out page which expressly indicated that employment was at the will of the company. The court stated that whatever legitimate expectations the plaintiff may have harbored regarding just cause employment became unreasonable when the defendant issued the handbook which clearly expressed the company's policy that employment was terminable at will. Consequently, the court held that the plaintiff's employment with the defendant was, as a matter of law, an at-will relationship.

Regardless of whether Mr. Hagen and Howmet had an express oral or written agreement of just cause employment prior to 1986, they reached a mutual agreement that employment was at will in 1986 when Mr. Hagen signed the application agreement. After signing the application agreement, he had no written agreement with Howmet that contradicted his at-will status. He cannot rely on the 1973 handbook because, even if he did not actually receive a copy of the new employee handbook, he had notice that a new

handbook had been issued. Accordingly, this Court finds that Mr. Hagen's employment was, as a matter of law, an at-will relationship.

### Jack Sturtevant

■ The question of whether Mr. Sturtevant is an at-will employee is a closer one because it hinges on the language in the 1973 handbook. Howmet argues that it should be granted summary judgment on the wrongful discharge claim regardless of whether or not Mr. Sturtevant was an at-will employee because Mr. Sturtevant was dismissed for a just cause—declining sales and orders in the Ti–Cast Division, in which he worked, which prompted a reduction in force. In the RIF, the third shift, on which Mr. Sturtevant was assistant foreperson, was eliminated. In deposition, Mr. Sturtevant was asked, "Would it be fair to say then Mr. Sturtevant, that you don't dispute the fact that declining business conditions at Ti–Cast caused layoffs, including your own, in 1990?" He answered, "I don't dispute that part of it, no."

The focus of Mr. Sturtevant's argument is that he should have been transferred to another position in the company because the company had a long-standing policy of classifying non-exempt salaried workers as laid-off rather than terminated and affording them the opportunity to transfer to other divisions when openings occurred. Mr. Sturtevant's evidence of Howmet's usual practice in making classifications does not establish a contract. He proffers no writing setting forth such a provision. In contrast, Howmet provides evidence that its policy was to classify employees "terminated/RIF" rather than "laid off" and pay severance immediately when a cutback in operations was anticipated to extend for more than six months. Howmet's human resource policy, as revised in May 1990, prior to Mr. Sturtevant's termination stated:

> Cutback in operations can be of two (2) forms—that of a temporary layoff or that of a permanent reduction in force. Temporary layoff is defined as being less than six (6) months in duration. No severance payment is authorized for temporary layoff. If the temporary layoff goes beyond

the six (6) month period, severance payment is authorized.

Absent an explicit contractual commitment, Howmet was not required to transfer Mr. Sturtevant, as he claims. "Where an employer reduces his workforce for economic reasons, it incurs no duty to transfer an employee to another position within the company." *Ridenour v. Lawson Co.*, 791 F.2d 52, 57 (6th Cir.1986). Moreover, the materiality of Mr. Sturtevant's classification is undermined by Howmet's evidence that those who were classified "terminated/RIF'" were not treated any differently than those classified "laid off" with respect to transfers to other divisions. Summary judgment is thus warranted on Mr. Sturtevant's breach of contract claim.

### "Necessary" RIF

Plaintiffs' counsel argues that Howmet was not justified in terminating either Mr. Sturtevant or Mr. Hagen because Howmet's reduction in force was not *necessary*. Plaintiffs rely on *Ewers v. Stroh Brewery Co.*, 178 Mich.App. 371, 443 N.W.2d 504 (1989), in which the Michigan Court of Appeals reversed a lower court's summary disposition of a wrongful discharge claim. At issue was "whether plaintiff's challenge to the bona fides of defendant's economic necessity defense entitles him to a jury determination of whether the economic necessity defense is the 'true reason' he was discharged." 178 Mich.App. at 376, 443 N.W.2d at 506. The *Ewers* court stated:

> There is no per se rule that a reduction in force constitutes good cause for termination. Certainly employers have the right to adjust their work forces in response to market forces and business necessity. However, they may not use such claims as pretexts for discharges which would otherwise be subject to a just-cause attack by the employee.

*Id.* at 378, 443 N.W.2d at 507. The court held that "[w]here an employer alleges discharge for economic necessity and the employee presents evidence that the economic necessity was pretextual and that he was discharged for another reason, the 'question of just cause' is one of fact for the jury." *Id.*

at 379, 443 N.W.2d at 507. In *Ewers*, the plaintiff presented evidence that defendant had a pattern of positive earning during the relevant period, had acquired additional breweries, and had increased the workforce from 600 to approximately 2,100. He also showed that "[t]he reduction in force was carried out with little or no advanced planning and with no study of its need or effect on the corporation, according to testimony of Stroh executives." *Id.* at 376, 443 N.W.2d at 506.

The Michigan Supreme Court further refined the law on just cause requirements for reduction in force terminations when it assessed the jury instructions that were used in the trial of the Stroh Brewery terminations. *McDonald v. Stroh Brewery Co.*, 191 Mich. App. 601, 608–09, 478 N.W.2d 669, 674 (1991), *appeal denied,* 439 Mich. 1012, 485 N.W.2d 541 (1992).[3] Plaintiffs contended that the trial court erred in instructing that defendant should prevail if the terminations were based on bona fide economic reasons without requiring economic necessity. The court affirmed the verdict and held that "a bona fide economic reason for the discharge constituted 'just cause' under *Toussaint.*" *Id.* 191 Mich.App. at 609, 478 N.W.2d at 674 (citing *McCart v. J. Walter Thompson USA, Inc.,* 437 Mich. 109, 114, 469 N.W.2d 284, 287 (1991)). The court further explained that "[a]lthough the economic reasons must be bona fide, there is no requirement that they rise to the level of a 'necessity.'" *Id.* at 608, 478 N.W.2d at 674. It also noted that the jury was properly instructed "that it was to decide only whether defendant's conduct was reasonable and not to substitute its judgment for defendant's business judgment." *Id.* at 609, 478 N.W.2d at 674. Thus, under Michigan law, plaintiffs have the burden to show that the company's reduction in force was not conducted for a bona fide economic reason.

In Mr. Sturtevant's case, Michael Malady, Human Resource Manager at Howmet, testified in deposition that Mr. Sturtevant was terminated because "Ti–Cast was being faced

with a downturn in business. The shift that Mr. Sturtevant was on, which was the third shift, was being eliminated, and third shift activities were being stopped." (Def.Ex. E at 7).

None of the evidence plaintiff presents, including Howmet's annual reports and the testimony of Ms. Johnson that Howmet had swelled its employee ranks prior to the RIF and continued to hire employees thereafter, refutes the claim that a downturn in the division in which Mr. Sturtevant worked prompted his termination. Moreover, Mr. Sturtevant does not dispute that the economic explanation Howmet offers is the reason he was terminated.

### Age Discrimination

Both Mr. Hagen and Mr. Sturtevant include a claim that they were terminated because of their age in violation of Michigan's Elliott–Larsen Civil Rights Act, M.C.L. 37.-2101 et seq. To sustain a claim for age discrimination, plaintiffs must prove that age was a determining factor in their termination. *Moody v. Pepsi–Cola Metropolitan Bottling Co.,* 915 F.2d 201, 208 (6th Cir.1990); *Matras v. Amoco Oil Co.,* 424 Mich. 675, 682–83, 385 N.W.2d 586, 589 (1986). As the Michigan Court of Appeals stated in *Farmington Educ. Ass'n v. Farmington School Dist.,* 133 Mich.App. 566, 351 N.W.2d 242 (1984), a plaintiff may prevail in an employment discrimination case by proof of *disparate treatment,* showing that defendant had a discriminatory motive, or by proof of *disparate impact,* showing that a facially neutral employment practice burdened the protected class more harshly than others.

To prevail on the disparate impact theory, discriminatory motive need not be proven, but plaintiffs must still show that age was a determinative factor in their discharge by establishing that the burden of the layoffs fell disproportionately on older employees. *Id.* at 572–73, 351 N.W.2d at 245. Under either theory,

---

**3.** Following the termination of 87 employees on November 16, 1981, several suits were filed. The *McDonald* court explained that "[b]ecause of the numerous individual suits filed, the parties agreed that a single action—that of John Mar-

tin—would be tried before a jury and that a decision in that case regarding defendant's liability would be binding in the other suits." *Id.* at 603–04, 478 N.W.2d at 674. The *McDonald* jury returned a verdict of no cause of action.

[A] plaintiff who has been terminated amidst a corporate reorganization carries a greater burden of supporting charges of discrimination than an employee who was not terminated for similar reasons. To meet his ultimate burden of demonstrating that he was a victim of age discrimination, the plaintiff, in addition to proving that he fell within the protected class, that he was terminated and that he was replaced by a younger individual, must come forward with additional direct, circumstantial, or statistical evidence that age was a determining factor in his termination.

*Ridenour*, 791 F.2d at 57.

### Disparate Treatment

■ In support of his claim of employment discrimination under the disparate treatment theory, Mr. Hagen asserts that he was replaced by a younger man, Mr. Hanslits. Yet Mr. Hagen has also acknowledged, in letters and deposition testimony, that the department in which he worked changed focus and the project on which he worked ended. In addition, he acknowledged that his training was in mechanical engineering and that Mr. Hanslits was trained as a metallurgical engineer and thus had a background more appropriate to the ongoing work in the Foundry Technology group. On the basis of this testimony and Howmet's unrefuted statements regarding Mr. Hanslits' qualifications and responsibilities, it is apparent that Mr. Hanslits was not a direct replacement for Mr. Hagen.

Mr. Hagen claims that he was also subject to age discrimination when he was not hired to fill openings that occurred at Howmet following his termination. Howmet has, however, demonstrated that those positions were not filled by substantially younger persons and that its hiring decisions were made on the basis of factors other than age. Mr. Hagen has thus failed to establish a prima facie case of age discrimination.

■ Jack Sturtevant was not replaced when the third shift was eliminated in the Ti–Cast division. He alleges that he suffered age discrimination by being classified "terminated/RIF" rather than "laid off" and by not being given work in one of the jobs that have opened at Howmet since his termination.

Howmet has provided evidence that age was not a factor in assigning an employee the designation "terminated/RIF." The classification was made pursuant to its written Human Relations Policy which directed that persons be classified "terminated/RIF" when a cutback was expected to last more than six months. Howmet also presented evidence that there is no significant difference between the designation "laid off" and "terminated/RIF" in terms of consideration for subsequent employment. Moreover, Howmet has demonstrated through Mr. Sturtevant's deposition testimony that he failed to take any steps to assert his seniority right. Mr. Sturtevant's allegations are thus insufficient to establish a claim of disparate treatment.

### Disparate Impact

■ Both plaintiffs argue that Howmet's reduction in force has a disparate impact on older employees. In the instant case, plaintiffs base their argument on a statistical analysis of Howmet's hiring data by Dr. William D. King, an economist retained by their law firm.

"For statistics to be valid and helpful in a discrimination case, 'both the methodology and the explanatory power of the statistical analysis must be sufficient to permit an inference of discrimination.'" *Simpson v. Midland–Ross Corp.*, 823 F.2d 937, 944 (6th Cir. 1987) (quoting *Segar v. Smith*, 738 F.2d 1249, 1274 (D.C.Cir.1984)). Dr. King's statistical analysis permits no such inference. He artificially distinguishes between people hired prior to 1984 and those hired thereafter. Moreover, Dr. King includes in his category of terminated employees more than sixty employees who retired during the period he analyzed. The calculations offered by Howmet's Human Resource Manager on the same data are more straightforward and do not include the artificial division between employees hired before and after 1984. Howmet's calculations show that the average age of the workforce at Howmet's Whitehall operations was 38.4 on January 1, 1990, and 40.56 on September 1, 1993, and that the average age of those terminated through RIF between January 1, 1990, and September 1, 1993 was 38.86. This data does not

support plaintiffs' claims of disparate impact. In such circumstances, judgment should be granted to defendant.

### CONCLUSION

For the reasons stated above, defendant's motions for summary judgment against plaintiff Jack Sturtevant (docket no. 35) and plaintiff Thomas Hagen (docket no. 46) are GRANTED and judgment is entered against plaintiffs on their claims of breach of contract and age discrimination. An Order consistent with this Opinion will be entered.

### ORDER

In accordance with the Opinion issued on this date.

**IT IS ORDERED** that defendant's motions for summary judgment against plaintiff Jack Sturtevant (docket no. 35) and plaintiff Thomas Hagen (docket no. 46) are **GRANTED** and judgment is entered against plaintiffs on their claims of breach of contract and age discrimination.